IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

Daniel K. Friend,                              )
                                               )    Civil Action No. 6:10-197-TLW-KFM
                            Plaintiff,         )
                                               )    **REPORT OF MAGISTRATE JUDGE**
            vs.                                )
                                               )
Michael J. Astrue,                             )
Commissioner of Social Security,               )
                                               )
                            Defendant.         )
_____            )

        This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

        The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

        The plaintiff filed applications for disability insurance benefits (DIB) and supplemental security income (SSI) benefits on July 28, 2006, alleging that he became unable to work on April 13, 2005. The applications were denied initially and on reconsideration by the Social Security Administration. Subsequently, the plaintiff requested a hearing. The administrative law judge, before whom the plaintiff, his attorney, and a vocational expert appeared on February 28, 2009, considered the case *de novo*, and on

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

April 13, 2009, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on November 24, 2009.  The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

(1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

(2)    The claimant has not engaged in substantial gainful activity since April 13, 2005, the alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.*).

(3)    The claimant has the severe impairments of cervical spondylosis; carpal tunnel syndrome; arthritis in the knees and shoulders; degenerative disc disease; and degenerative joint disease (20 CFR 404.1521 *et seq.* and 416.921 *et seq.*).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404 Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

(5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a reduced range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant is limited to occasional climbing of ramps or stairs and occasional crawling and must avoid work that requires him to climb ladders, ropes, or scaffolding. He is further limited to frequent reaching in all directions and to frequent handling or fingering with his right hand and claimant must avoid concentrated exposure to moving machinery or to unprotected heights. Additionally, the claimant is limited to simple, repetitive, and routine tasks.

(6)    The claimant is not able to return to any example of his past relevant work (20 CFR 404.1565 and 416.965).

(7)    The claimant was born on November 17, 1963 and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

2

(8)     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

(9)     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

(10)     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

(11)     The claimant has not been under a disability, as defined in the Social Security Act, from April 13, 2005 through the date of this decision (2o CFR 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."   42 U.S.C. §423(a).   "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which

3

equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v.*

4

*Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a  verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that the conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).


## EVIDENCE PRESENTED

The record reveals that on April 13, 2005, the plaintiff, then age 41, was driving a wheelchair van when he was rear-ended at a traffic light (Tr. 130-31, 208, 243-58, 370-77).  Subsequently, the plaintiff complained of back, neck, and right knee pain and was taken to a hospital, where he was treated for neck muscle strain and deep bruises (x-rays were normal other than showing mild degenerative joint disease in his neck) (Tr. 131, 243-58, 370-77, 384-86).

The following day, the plaintiff began chiropractic treatment with Clay W. Wickiser, D.C., and complained of back pain, right arm pain, left hand pain, thumb twitching, and right shoulder pain (Tr. 131, *see* Tr. 268-91).  Dr. Wickiser provided "out of work" slips for April 18 through June 27, 2005 (Tr. 272-83).  On May 4, 2005, Dr. Wickiser wrote a letter stating that the plaintiff "needs to be able to work on a light duty basis" because his increased pain prevented him from performing his regular job duties (Tr. 233, 263).  X-rays of the plaintiff's neck taken one week later revealed straightening of the normal cervical

5

curve (lordosis) and ligament damage (Tr. 237, 241), as well as disc narrowing and spurring (Tr. 267).  On June 7, Dr. Wickiser wrote a letter reiterating that the plaintiff "needs to work on a light duty basis," and "needs to be able to work at a job that allows him to frequently change his activity and allows him to be able to change his body position" (Tr. 232).

Later in June 2005, the plaintiff presented to orthopedist Jessie R. Wilson, M.D.  On examination, he had spinal tenderness and decreased neck motion, but good shoulder range of motion, good strength in his upper extremities, normal sensation, and symmetrical reflexes (Tr. 313).  Dr. Wilson assessed cervical sprain with underlying degenerative disc disease, recommended conservative treatment (physical therapy and nonsteroidal anti-inflammatory medications), and stated "I do not think he is able to work at this time with a significant restricted range of motion and discomfort, though if there were light duty activities which would not aggravate this problem that does not appear to be [sic] at this time" (Tr. 312, 314, 327, 329).

Between June and September 2005, the plaintiff underwent six physical therapy sessions (Tr. 296-305).  On June 27, Dr. Wilson excused him from work for six more weeks (Tr. 315, Tr. 356).  In July, she observed that the plaintiff had "minimal" to "mild" tenderness in his back muscles, good forward flexion, the ability to stand on his heels and toes with no increased pain, good hip range of motion, negative straight leg raise testing (for signs of nerve root irritation), full (5/5) strength in his hips and knees, and good sensation in both legs (Tr. 310, Tr. 325, 355).  The plaintiff said his pain had improved over the last month and denied having any numbness, tingling, or pain radiating into his legs (Tr. 310).  Dr. Wilson prescribed a cervical collar (Tr. 310).  In August, she observed that the plaintiff had "good normal motor function and his paresthesia [tingling sensation] is really not specifically in nerve root distribution" (Tr. 309).  Yet she opined, "I do not feel at this time he can return to work" (Tr. 309, Tr. 324).  She excused him from work until October 25 (Tr. 319-20).

6

In a September 2, 2005, consultative examination, H. Dean Reeves II, M.D., observed that the plaintiff was in no apparent distress, had a supple neck with no specific spinal tenderness and mild muscular tenderness, was fully alert and oriented with a somewhat blunted affect, and had full 5/5 motor strength throughout, mildly decreased sensation in the left hand, normal reflexes and coordination, and a normal gait (including heel-walking, toe-walking, and tandem gait) (Tr. 343).  The plaintiff said medication was helping his headaches and neck pain somewhat (Tr. 344).  An MRI of the plaintiff's neck subsequently revealed mild to moderate disc displacements, mild canal narrowing, and mild to moderate foraminal encroachment (Tr. 292, Tr. 348, 350).  A brain MRI revealed a sinus mucous cyst and no evidence of any other mass (Tr. 294, Tr. 352).

On September 19, 2005, Dr. Wilson observed that the plaintiff's neck movement was "definitely better," but that he still had pain (Tr. 308, Tr. 323).  She recommended pain management and opined, "[h]e has to continue his out-of-work status as there is no light duty work available" (Tr. 308).  A nerve conduction study three days later revealed mild to moderate right carpal tunnel syndrome and mild left radiculopathy (nerve dysfunction) in the plaintiff's neck (Tr. 330-31, Tr. 337-38).  The plaintiff denied having any difficulty with his current medications (Tr. 332).

Upon Dr. Wilson's referral, the plaintiff began seeing pain specialist Eric Loudermilk, M.D., in October 2005 (Tr. 362-64, Tr. 365-67, 433-35, 537-40).  Other than mild tenderness and a positive sign of right carpal tunnel syndrome, musculoskeletal and neurological examinations were "fairly normal" (Tr. 366).  Dr. Loudermilk diagnosed cervicalgia (neck pain)/whiplash injury and cervical spondylosis (neck arthritis) with possible right upper extremity radiculopathy (Tr. 364).  He prescribed medications and provided a series of cervical facet joint injections (Tr. 364, 374).

The plaintiff acknowledged in December 2005 that the injections helped his neck pain considerably, and that medications "definitely helped," but that he dropped things due to right-sided weakness (Tr. 429, Tr. 516).

Dr. Loudermilk prescribed wrist splints for the plaintiff in January 2006 (Tr. 515). A CT scan and x-rays did not reveal any new findings (Tr. 378, 383). Also that month, neurosurgeon Aaron McDonald, M.D., examined the plaintiff, found normal motor strength, sensation, reflexes, and gait, and recommended conservative pain management rather than surgery (Tr. 353, 389-91). At a subsequent followup with Dr. Loudermilk, the plaintiff stated that medication and injections had given him some pain relief (Tr. 448).

In February and March 2006, the plaintiff said his headaches had improved after a recent medication adjustment, and that medications and injections had given him some relief without side effects (Tr. 446-47, Tr. 513-14). In April, he again reported that medication "helped his pain significantly," and that a soft cervical collar "worked well" (Tr. 445). Dr. Loudermilk referred him for a work hardening program (Tr. 445). In June, Dr. Loudermilk noted that the plaintiff was "doing well" with pain medications, but had a recent flare-up (Tr. 426, Tr. 511). He administered additional cervical injections (Tr. 426-27).

The plaintiff underwent a functional capacity evaluation by physical therapist Matt Brandel, RPT, on July 18, 2006 (Tr. 393-422). He demonstrated the ability to lift 20 pounds frequently, balance, stoop, crouch, kneel, and walk (Tr. 393). He had deficits in low lifting, reaching, handling, sitting, and standing (Tr. 393). Mr. Brandel assigned a 46% whole person impairment rating (Tr. 419, 420), and concluded that the plaintiff's "return to work status for previous employment would be significantly impaired by the cervical and wrist ROM [range of motion] due to the driving requirements. I also feel his ability to push wheelchairs and transfer patients falls well below job demand levels" (Tr. 393).

The following day, Dr. Loudermilk noted that the plaintiff's medications were "working well," and that he tolerated them without any side-effects (Tr. 454, Tr. 508, 512).

8

He wrote a note excusing the plaintiff from work until October 1 (Tr. 453), and noted that the plaintiff "will not be able to return to his previous job based on the results of his functional capacity evaluation. He will probably need vocational rehabilitation to reenter the job market in another area" (Tr. 454).

On August 7, 2006, Dr. Loudermilk opined that the plaintiff was "not able to return to work at this time" (Tr. 525). A few weeks later, he noted that the plaintiff's neck pain was "doing well with his current medication regimen," and the plaintiff denied having any medication side-effects (Tr. 470, Tr. 507). Examination revealed normal upper extremity strength and reflexes (Tr. 470). Dr. Loudermilk began another series of cervical injections (Tr. 471-79).

A September 13, 2006, MRI of the plaintiff's neck revealed mild to moderate disk displacements with mild spinal canal narrowing and mild to moderate foraminal encroachments, slightly more pronounced on the left (Tr. 132). The following month, the plaintiff told Dr. Loudermilk that his neck pain had improved after the recent injections, but that his low back pain and carpal tunnel symptoms were not improving (Tr. 134).

On September 25, 2006, state agency physician George Chandler, M.D., reviewed the plaintiff's medical records and determined that he could lift 50 pounds occasionally and 25 pounds frequently; stand, walk, or sit for about six hours each in an eight-hour workday; frequently climb ramps or stairs, balance, stoop, kneel, and crouch; occasionally crawl and climb ladders, ropes, or scaffolds; and that he needed to avoid constant overhead reaching, handling, and fingering (Tr. 480-87).

On October 27, 2006, the plaintiff told Dr. Loudermilk that he was "doing a lot better with respect to his neck pain," but that his carpal tunnel syndrome was not improving (Tr. 506). Dr. Loudermilk noted that medications "do a good job at keeping his pain manageable," and that he had no side-effects (Tr. 506).

9

On December 6, 2006, state agency physician Frank Ferrell, M.D., reviewed the plaintiff's medical records and reached the same conclusions as Dr. Chandler, except Dr. Ferrell found the plaintiff could only occasionally climb ramps or stairs and never climb ladders, ropes, or scaffolds, and that he needed to avoid concentrated exposure to hazards such as machinery and heights due to his medication use and chronic pain (Tr. 488-95).

On December 13, 2006, Dr. Loudermilk once again noted that the plaintiff tolerated medication without side-effects, and prescribed Cymbalta (an antidepressant) because the plaintiff appeared "somewhat depressed" (Tr. 505).  He completed a checklist form in which he opined, in part, that the plaintiff could sit, stand, and walk for one hour at a time each, sit for a total of four hours, and stand and walk a total of two hours each in an eight-hour day (Tr. 524).  He found the plaintiff capable of lifting 25 pounds occasionally and 20 pounds frequently; using his hands for simple grasping but not for repetitive pushing or pulling or fine manipulation; and occasionally bending, squatting, crawling, and reaching (Tr. 524).

The following day, Dr. Loudermilk completed a multiple-choice form indicating that activities such as walking, standing, bending, stooping, and moving the extremities would greatly increase the plaintiff's pain and cause distraction or even total abandonment of tasks (Tr. 135).  He expected the plaintiff's pain or medication side effects to cause inattentiveness and drowsiness (Tr. 523).

On January 22, 2007, Dr. Loudermilk noted that the plaintiff was "doing better from a depression standpoint" since starting Cymbalta and still tolerated medication without side effects (Tr. 503).

The plaintiff underwent an evaluation by vocational counselor Randy Adams on February 13, 2007 (Tr. 208-15).  The plaintiff said his activities of daily living included feeding his pets, washing dishes a few at a time, lying down, checking and reading the mail, laundering clothes, making simple meals, talking on the telephone, driving to check on his

10

mother-in-law, taking a nap, going to the grocery store with his wife, attending church three times per week, working as a part-time pastor six hours per week, helping his wife cook and clean, reading, shopping, vacuuming, and playing piano 15 to 20 minutes at a time (Tr. 210-11).  He denied feeling depressed (Tr. 211), but was "moderately depressed" according to a self-report inventory (Tr. 212-13).  Nevertheless, Mr. Adams concluded that the plaintiff was "permanently and totally disabled from any work"(Tr. 215).

On February 19, 2007, Dr. Loudermilk completed a checklist form, opining that the plaintiff was "disabled from any type of gainful work activity" (Tr. 521).  At an unspecified date, the plaintiff underwent a vocational assessment by rehabilitation specialist Kevin M. Fullard.  Mr. Fullard concluded that the plaintiff "can perform work within a Light Physical Demand Level with no frequent lifting greater than 20 lbs." (Tr. 138).

On July 2, 2007, Dr. Loudermilk completed another checklist form reiterating his opinion that the plaintiff was disabled (Tr. 519-20).  Nine days later, he noted that the plaintiff's pain was stable on medication, that he had no side-effects and was pleased with his regimen, and that his neck pain "continue[d] to do a lot better" since his cervical injections nearly one year earlier (Tr. 542, Tr. 552).

As of August 2007, the plaintiff's neck and arm pain were stable on medications, and a TENS unit helped "a lot" (Tr. 541, Tr. 551).  On September 4, 2007, the South Carolina Workers Compensation Commission issued a decision finding the plaintiff "permanently and totally disabled" as a result of his injuries (Tr. 140, *see* 126-43).  This finding was upheld on appeal (Tr. 144-49, 227-29).

In October 2007, the plaintiff complained of increased morning headaches. Dr. Loudermilk noted it had been over a year since his last cervical injection, and that they had "worked well for him" in the past (Tr. 536, Tr. 550).  Dr. Loudermilk was pleased with the results, and the plaintiff denied any side-effects (Tr. 536).

11

Between December 2007 and December 2008, the plaintiff and Dr. Loudermilk repeatedly stated that the plaintiff's medications, TENS unit, and past injections "worked well," gave him "good relief" or "considerable relief," and did "a good job at keeping his pain manageable," and the plaintiff reported that he was "doing a lot better" (Tr. 526-535, duplicated at Tr. 543-49). Dr. Loudermilk was "pleased that we are able to manage his pain without addictive narcotic medication" (Tr. 528).

On January 24, 2009, Dr. Loudermilk completed another multiple choice questionnaire in which he opined that the plaintiff's side effects and pain would cause distraction or abandonment of tasks, and could be severe and limit his effectiveness due to inattentiveness and drowsiness (Tr. 556-58). He also completed a Work Capacity and Pain Rating form, in which he opined that the plaintiff's pain would interfere with his ability to maintain concentration throughout an eight-hour workday, interfere with his ability to stay on task for two consecutive hours, cause him to take excessive breaks, and cause him to miss more than two work days per month (Tr. 559). Dr. Loudermilk opined the plaintiff would need to rest in a reclining chair, and that he could sit, stand, and walk for less than a combined eight hours during an eight-hour day (Tr. 560). He concluded, "[g]iven this patient's chronic, diffuse pain and medication requirements, I do not feel he would be suitable to maintain a status of full-time gainful employment" (Tr. 560).

At the February 2009 administrative hearing, the plaintiff testified that he currently worked as a part-time pastor at a small church, where he preached two sermons on Sundays, and that he started working there in March 2005 (Tr. 24-26). He said he wore his cervical collar only while driving "on bad days," and that the cane he used had been given to him as a gag gift on his 40th birthday (Tr. 28). He said medications made his headaches "bearable" and helped his back pain (Tr. 29). He described left leg pain and numbness, muscle spasms in his wrists and legs, difficulty swallowing, difficulty concentrating, tremors in his hands, and high blood pressure (Tr. 30-31). With regard to

12

his abilities and activities, the plaintiff estimated he could walk for five minutes with his cane, stand for 25 minutes if he held onto something, sit for "a couple hours" with frequent position changes, and lift less than five pounds (Tr. 32). He said he typically stayed home, read, listened to music, and tried to "help out a little bit around the house" (Tr. 33). He went shopping with his wife, using a motorized chair, did laundry, took out the garbage, washed dishes, cared for his personal needs, and drove a car three times per week (Tr. 34-35, 47).

Vocational expert Carl Welding testified at the hearing that the plaintiff's current part-time work as a church pastor was skilled light exertion work, and that his past work was semi-skilled light to medium exertion work (Tr. 49). The ALJ asked Mr. Welding to consider a hypothetical individual of the plaintiff's age, education, and work experience, with the following limitations:

- can lift up to 20 pounds occasionally and 10 pounds frequently;
- can stand, walk, and sit for six hours each per eight-hour workday;
- can occasionally climb ramps and stairs and never climb ladders, ropes, or scaffolds;
- can occasionally crawl;
- can frequently handle and finger with the right hand (no limitations on the left) and reach;
- needs to avoid concentrated exposure to unprotected heights, and
- can perform simple, routine, repetitive tasks

(Tr. 49-50). Mr. Welding testified that the individual could not perform the plaintiff's past work, but could perform other unskilled light jobs, including the representative jobs of hand packager (2,700 jobs in the upstate area and 348,000 jobs nationwide) and inspector (2,100 jobs in the upstate area and 472,000 jobs nationwide) (Tr. 51-52).

After the ALJ's April 2009 decision, the plaintiff submitted additional evidence to the Appeals Council (Tr. 561-83), including a September 2009 treatment note from Jerry S. Purcell, M.D., the plaintiff's treating family physician, diagnosing dizziness, hypertension, a neck disorder, type II diabetes mellitus, peripheral neuropathy, and hyperlipidemia (high cholesterol and triglycerides) (Tr. 571, duplicated at Tr. 583). A September 2009 brain MRI revealed a cortical mass consistent with atypical meningioma (Tr. 562, duplicated at Tr. 570,

13

582). On September 22, 2009, Dr. Purcell completed a questionnaire in which he opined that, due to type II diabetes, hyperlipidemia, and carpal tunnel syndrome, the plaintiff experienced pain or other symptoms sufficient to frequently interfere with the attention and concentration needed to perform even simple work tasks; was capable of only low stress jobs; could sit, stand, and walk for less than two hours each in an eight-hour day; needed to change positions at will and take hourly breaks; needed to use a cane when standing or walking; could never lift more than 10 pounds; had significant limitations with reaching, handling, and fingering; could rarely or never twist, stoop, crouch, or climb; had numerous environmental restrictions; and would be absent more than four days per month; and that the plaintiff's symptoms and limitations had been present since "July 2005 per patient" (Tr. 565-69, duplicated at Tr. 577-81). The Appeals Council considered this evidence and found it did not provide a basis for changing the ALJ's decision (Tr. 1-2).

## ANALYSIS

The plaintiff alleges disability commencing April 13, 2005, due to injuries from a motor vehicle accident, carpal tunnel syndrome, headaches, chronic pain, and degenerative spinal conditions. The plaintiff was 41 years old on his alleged onset date and was 45 years old on the date of the ALJ's decision. He has a college education and past relevant work as a van driver, a security worker, and transporter. The ALJ found that the plaintiff had the severe impairments of cervical spondylosis; carpal tunnel syndrome; arthritis in the knees and shoulders; degenerative disc disease; and degenerative joint disease. The ALJ further found that the plaintiff could not perform his past relevant work but had the RFC to perform a reduced range of light work, and he could perform such occupations as hand packaging and inspector. The plaintiff argues that the ALJ's decision is not supported by substantial evidence and the ALJ erred by (1) failing to properly consider the opinions of Dr. Loudermilk; (2) failing to properly consider his subjective complaints of

pain; and (3) failing to properly consider the decision of the South Carolina Workers' Compensation Commission that the plaintiff was totally disabled. The plaintiff further argues that the Appeals Council ignored certain evidence.  In his reply brief, the plaintiff argues that the ALJ erred by failing to conduct a proper analysis of whether his impairments met or medically equaled Listings 1.02 and 1.04.

### Treating Physician

The plaintiff argues that the ALJ failed to properly consider the opinions of treating physician, Dr. Lourdermilk.  On August 7, 2006, Dr. Loudermilk opined that the plaintiff was "not able to return to work at this time" (Tr. 525).  On January 24, 2009, Dr. Loudermilk completed a Work Capacity and Pain Rating form, in which he opined that the plaintiff's pain would interfere with his ability to maintain concentration throughout an eight-hour workday, interfere with his ability to stay on task for two consecutive hours, cause him to take excessive breaks, and cause him to miss more than two work days per month (Tr. 559).  Dr. Loudermilk opined the plaintiff would need to rest in a reclining chair, and that he could sit, stand, and walk for less than a combined eight hours during an eight-hour day. He concluded, "[g]iven this patient's chronic, diffuse pain and medication requirements, I do not feel he would be suitable to maintain a status of full-time gainful employment" (Tr. 560).

The ALJ found as follows with regard to Dr. Loudermilk's opinions:

> As a treating physician, the opinion of Dr. Loudermilk would normally be accorded significant weight. However, his pain assessment of January 24, 2009, is inconsistent with treatment notes and the claimant's reports of pain. The claimant, as described in Dr. Loudermilk's treatment notes, is managed well without narcotic medications and with no complaints of adverse side effects, such as somnolence or poor concentration.

(Tr. 16).

The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 416.927(b), and, unless a treating source's opinion is given controlling weight,

weighed according to the following non-exclusive list: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 416.927(d)(2)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled," "unable to work," meets the Listing requirements, or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(d)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling 96-2p, 1996 WL 374188, requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. *Id.* at *5. As stated in Ruling 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 416.927]. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

The Commissioner argues that the ALJ appropriately considered Dr. Loudermilk's opinions and that his decision is based upon substantial evidence (def. brief 12-14). However, it is impossible to determine from the ALJ's decision how much, if any, weight was given to Dr. Loudermilk's opinions. As stated above, a finding that a treating

16

physician's opinion is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. The opinion is still entitled to deference and must be weighed using all of the factors set forth above. The ALJ did not do so. Upon remand, the ALJ should be instructed to consider the opinions of Dr. Loudermilk in accordance with the above-cited law and to fully articulate the weight given to this treating physician's opinions and the reasons therefor.

***Pain***

The plaintiff further argues that the ALJ erred by failing to properly evaluate the disabling effects of his chronic pain syndrome in his neck, back, head, right knee, and both hands. The plaintiff testified at the hearing that he is unable to work primarily due to chronic pain and depression (Tr. 26-27). He further testified that he takes Cymbalta for depression and chronic nerve pain prescribed by Dr. Loudermilk, his pain management physician. He also uses a TENS unit and a muscle stimulator to relieve his back pain, and he has carpal tunnel syndrome in both of his wrists. The plaintiff stated that he also suffers from migraine headaches (Tr. 27-28). He testified that when he stands his left leg goes completely numb, and he also has muscle spasms in his wrists and legs. He has a stabbing pain in the lower part of his legs. The plaintiff also has described chronic pain in his right shoulder since the accident. He testified he uses a cane to walk from his car to the front of a store (Tr. 31). He can stand if he is holding onto something for approximately 25 minutes, and he can sit for about 2 hours as long as he is able to change his positions frequently. He testified that he can only lift about 5 pounds occasionally (Tr. 31-32).

The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or

> psychological abnormalities and which could reasonably be
> expected to produce the pain or other symptoms alleged. . . .
> It is only after a claimant has met her threshold obligation of
> showing by objective medical evidence a medical impairment
> reasonably likely to cause the pain claimed, that the intensity
> and persistence of the claimant's pain, and the extent to which
> it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). A claimant's symptoms, including

pain, are considered to diminish his capacity to work to the extent that alleged functional

limitations are reasonably consistent with objective medical evidence and other evidence.

20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor

recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific

evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271

F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision

"must contain specific reasons for the finding on credibility, supported by the evidence in the

case record." Furthermore, it "must be sufficiently specific to make clear to the individual

and to any subsequent reviewers the weight the adjudicator gave to the individual's

statements and reasons for that weight." SSR 96-7p, 1996 WL 374186, *4.

      The factors to be considered by an ALJ when assessing the credibility of an

individual's statements include the following:

      (1)    the individual's daily activities;

      (2)    the location, duration, frequency, and intensity of the
            individual's pain or other symptoms;

      (3)    factors that precipitate and aggravate the symptoms;

      (4)    the type, dosage, effectiveness, and side effects of any
            medication the individual takes or has taken to alleviate
            pain or other symptoms;

      (5)    treatment, other than medication, the individual receives
            or has received for relief of pain or other symptoms;

      (6)    any measures other than treatment the individual uses
            or has used to relieve pain or other symptoms (e.g.,

> lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> (7)   any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, *3.

The ALJ found that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effect of these symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity assessment" (Tr. 15). In making the credibility finding, the ALJ noted the lack of supporting objective medical findings (Tr. 15). *See* 404.1529(c)(2) (cannot reject subjective complaints "solely" based on objective medical evidence). The ALJ also noted that the plaintiff's symptoms responded well to conservative treatment, including his own admissions that he was doing well on the pain medications (Tr. 15). The ALJ concluded, "While I am cognizant that 'doing well' in the context of pain management does not indicate a complete lack of discomfort, it does indicate that [the plaintiff] was largely pleased with the remission of pain and able to function satisfactorily" (Tr. 15).

The ALJ also cited the opinion evidence that detracted from the plaintiff's allegations of disabling pain (Tr. 15-16), including those of Dr. Wickiser, a treating chiropractor who on June 7, 2005, wrote a letter reiterating that the plaintiff "needs to work on a light duty basis" and "needs to be able to work at a job that allows him to frequently change his activity and allows him to be able to change his body position" (Tr. 232); Mr. Brandel, a physical therapist who performed a functional capacity evaluation of the plaintiff on July 18, 2006, and concluded the plaintiff demonstrated the ability to lift 20 pounds frequently, balance, stoop, crouch, kneel, and walk, and had deficits in low lifting, reaching, handling, sitting, and standing (Tr. 393-422); and the two state agency physicians, who both

found the plaintiff could perform a range of medium work with certain restrictions (Tr. 480-87; 488-95).  The ALJ also noted that while the plaintiff used a cane at the hearing, it had been given to him as a practical joke on his 40th birthday, not prescribed by a physician (Tr. 15, *see* Tr. 28). The ALJ noted elsewhere in the decision that, while the plaintiff's ongoing part-time work as a church pastor was not presumptive of substantial gainful activity, it was "indicative of his functional aptitude and abilities" (Tr. 11).

As argued by the Commissioner, the ALJ's credibility finding was properly analyzed and based upon substantial evidence (def. brief 17-18). Furthermore,  while the ALJ did not find the plaintiff's allegations of disabling pain fully credible, he gave the plaintiff the benefit of the doubt by finding him limited to only a reduced range of simple, routine, repetitive light work with restrictions on climbing, crawling, reaching, handling and fingering with his right hand, and exposure to hazards (Tr. 14, 17).  Based upon the foregoing, this allegation of error is without merit.

### South Carolina Workers' Compensation Decision

The plaintiff further argues that the ALJ erred by not giving proper weight to the decision of the South Carolina Workers' Compensation Commission that he has been totally disabled since April 13, 2005, as the result of his work-related accident.  The ALJ did not mention the decision in his findings (*see* Tr. 9-18).  The Commissioner argues that disability decisions by other agencies (e.g., the Workers' Compensation Commission) are not binding in Social Security determinations, as they are based on different standards. *See* 20 C.F.R. § 404.1504 ("A decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency that you are disabled or blind is not binding on us.").  While the decision is

not *binding*, it should be considered. *DeLoatche v. Heckler*, 715 F.2d 148, 150 n.1 (4th Cir. 1983) ("[T]he determination of another governmental entity [is not] binding on the Secretary. Nevertheless, . . . the disability determination of a state agency is entitled to consideration by the Secretary."). Accordingly, upon remand, the ALJ should be instructed to consider the decision of the South Carolina Workers' Compensation Commission finding the plaintiff disabled since April 13, 2005 (*see* Tr. 126-49).

### Listing Analysis

In his reply brief, the plaintiff argues that the ALJ erred in failing at step three of the sequential evaluation process to conduct a proper analysis of whether his impairments met or medically equaled any of the criteria for Listing 1.00 *et seq.*, *Muskuloskeletal System*. Specifically, the plaintiff argues that the ALJ should have considered Listing 1.04, *Disorders of the spine*, and Listing 1.02, *Major dysfunction of a joint(s) (due to any cause)*. This court agrees.

The regulations state that upon a showing of a listed impairment of sufficient duration, "we will find you disabled without considering your age, education, and work experience." 20 C.F.R. § 404.1520(d). A listing analysis includes identifying the relevant listed impairments and comparing the criteria with the evidence of the plaintiff's symptoms. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (stating that "[w]ithout such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination"); *Beckman v. Apfel*, C.A. No. WMN-99-3696, 2000 WL 1916316, *9 (D. Md. 2000) (finding that where there is "ample factual support in the record" for a particular listing, the ALJ should perform a listing analysis).

As set forth above, the ALJ identified the plaintiff's severe orthopaedic impairments, including cervical spondylosis, arthritis in knees and shoulders, degenerative disc disease, degenerative joint disease, and bilateral carpal tunnel syndrome. The ALJ

21

stated in his decision, "The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments . . . " (Tr. 14). However, the ALJ did not specifically identify the appropriate listings and compare the criteria to the evidence of the plaintiff's impairments.  Without such an analysis, it is impossible for this court to determine whether the ALJ's determination at step three was based upon substantial evidence.  Therefore, upon remand, the ALJ should be instructed to discuss the plaintiff's musculoskeletal impairments, including his cervical, wrists, shoulder, and knee problems, and compare the evidence of his symptoms to each of the listed criteria of the appropriate listing(s).

### Additional Evidence

Lastly, the plaintiff argues that the Appeals Council "ignored" post-decision medical records from Dr. Purcell (pl. brief 7).  After the ALJ's April 2009 decision, the plaintiff submitted additional evidence to the Appeals Council (Tr. 561-83), including a September 2009 treatment note from Jerry S. Purcell, M.D., the plaintiff's treating family physician, diagnosing dizziness, hypertension, a neck disorder, type II diabetes mellitus, peripheral neuropathy, and hyperlipidemia (high cholesterol and triglycerides) (Tr. 571, duplicated at Tr. 583). A September 2009 brain MRI revealed a cortical mass consistent with atypical meningioma (Tr. 562, duplicated at Tr. 570, 582). On September 22, 2009, Dr. Purcell completed a questionnaire in which he opined that, due to type II diabetes, hyperlipidemia, and carpal tunnel syndrome, the plaintiff experienced pain or other symptoms sufficient to frequently interfere with the attention and concentration needed to perform even simple work tasks; was capable of only low stress jobs; could sit, stand, and walk for less than two hours each in an eight-hour day; needed to change positions at will and take hourly breaks; needed to use a cane when standing or walking; could never lift more than 10 pounds; had significant limitations with reaching, handling, and fingering;

could rarely or never twist, stoop, crouch, or climb; had numerous environmental restrictions; and would be absent more than four days per month; and that the plaintiff's symptoms and limitations had been present since "July 2005 per patient" (Tr. 565-69, duplicated at Tr. 577-81).

As argued by the Commissioner, the Appeals Council did not "ignore" the additional evidence submitted after the ALJ's decision. The Appeals Council considered this evidence, incorporated the evidence into the record (Tr. 561-83), and found it did not provide a basis for changing the ALJ's decision (Tr. 1-5). As this court recommends that the matter be remanded to the ALJ for further consideration based upon the errors described above, the ALJ should also be instructed upon remand to consider all of the evidence in the record, including the evidence submitted after the ALJ's April 2009 decision, in the further proceedings. *See Jividen v. Astrue*, No. 2:10-cv-00237, 2010 WL 5158392, at *6 (S.D. W.Va. November 18, 2010) (slip copy) ("The Appeals Council specifically incorporated the new evidence into the administrative record. As a result, the court must review the record as a whole, including the new evidence, in order to determine if the Commissioner's decision is supported by substantial evidence.") (citing *Wilkins v. Secretary*, 953 F.2d 93, 96 (4th Cir.1991)).

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. § 405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

January 18, 2011                                    s/Kevin F. McDonald
Greenville, South Carolina                         United States Magistrate Judge

23